Filed 7/22/24  P. v. Ruvalcaba CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081221 |
| v. | (Super.Ct.No. SWF1907258) |
| VANESSA MICHELLE RUVALCABA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Timothy F. Freer, Judge.

Affirmed with directions.

Athena Shudde and William Paul Melcher, under appointment by the Court of

Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina

and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and

Respondent.

1

## I. INTRODUCTION

In 2019, law enforcement officers responded to an emergency call and discovered a white box truck parked along the side of a freeway. Inside the truck, officers discovered defendant and appellant, Vanessa Ruvalcaba, alongside the body of H.D., who had been stabbed over 80 times, including in the face, chest, legs, and abdomen. As a result of this incident, defendant was convicted by a jury of first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189) and sentenced to state prison for a term of 25 years to life, as well as a consecutive term of one year for the personal use of a deadly weapon in the commission of the offense.

Defendant appeals, arguing that: (1) there was insufficient evidence that she harbored the mental state necessary for a conviction under either theory of first degree murder submitted to the jury; (2) the trial court erred in giving a special jury instruction explaining that the doctrine of imperfect self-defense did not apply if the jury determined that defendant's belief in the need for self-defense was the result of total delusion; and (3) the abstract of judgment must be corrected to accurately reflect the trial court's pronouncement of judgment. We find no instructional error on this record and further conclude that sufficient evidence in the record supports defendant's conviction for first degree murder. However, we agree with defendant and the People that the abstract of judgment does not accurately reflect the trial court's oral pronouncement, and we direct the trial court to amend the abstract of judgment accordingly.

---

[1] Undesignated statutory references are to the Penal Code.

## II. BACKGROUND

### A. *Facts and Charges*

On the morning of April 20, 2019, law enforcement officers were dispatched to respond to a report of a female running across the lanes of a highway. When officers arrived at the scene, they encountered defendant and H.D.'s body inside of a white box truck parked on the side of the freeway. Officers observed that defendant's hands were covered in blood and H.D.'s neck had been cut open. As a result of this incident, defendant was charged with one count of murder (§187, subd. (a)). Additionally, the information alleged that defendant personally used a deadly and dangerous weapon in the commission of the charged offense (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)).

### B. *Relevant Evidence at Trial[2]*

#### 1. Eyewitness Testimony

Multiple eyewitnesses testified that on the morning of April 20, 2019, they saw a box truck parked on the right shoulder of the freeway and a woman running across the lanes of the freeway. The woman was screaming, appeared frightened, and was running from the shoulder where the truck was parked toward the freeway median. One witness testified that he saw the woman run back toward the box truck, scream at the driver's window, and open the driver's side door to the truck. When the woman opened the door,

---

[2] Because defendant only challenges the sufficiency of the evidence to prove she harbored the necessary mental state to be convicted of first degree murder, we focus our summary on the evidence relevant to this issue, while only briefly summarizing the remaining evidence to provide context.

the witness observed a man seated in the driver's seat, slouched over and bleeding from his stomach area. The witness did not see any blood, cuts, or wounds to the man's face or to other parts of the man's body.

2. Testimony of Law Enforcement Personnel

Several law enforcement personnel involved with the response and investigation of the case were called to testify. When officers first arrived at the scene of the incident, they encountered defendant in the passenger seat of a box truck, lying on her stomach, with her feet fluttering outside the door of the vehicle. An officer asked defendant what she was doing and defendant immediately turned around; stated, " 'He's trying to kill me' "; exited the vehicle; and lay on the ground without prompting. The officer observed blood on defendant's face, hands, and clothing.[3] The victim's body was in the driver's seat of the vehicle, and the victim appeared to have been stabbed several times.

A bloody knife was recovered from the passenger seat of the box truck. While the knife was located near the victim's hand, the blade faced the victim. After defendant was arrested, law enforcement personnel documented what appeared to be a possible black eye and "some minor nicks" on defendant's hands, but they did not observe any other injuries, bruising, or defensive wounds on defendant.

Investigators reviewed text messages on mobile phones associated with defendant and the victim. Approximately two weeks prior to the incident, messages were sent from

---

[3] The responding officer's initial encounter with defendant was recorded by the officer's body camera, and the video recording was played for the jury.

defendant's phone to the victim's phone, which accused the victim of infidelity.[4]  The

next day, messages sent from the victim's phone to defendant's phone accused defendant

of infidelity.  These messages were interspersed with messages of apologies, expressions

of a continued commitment to their relationship, as well as mutual messages expressing

love.  Additionally, on the morning of the incident, several text messages were sent from

defendant's phone to family and friends expressing the belief that the end was near and

citing to religious texts.

    3.  <u>Forensic Evidence</u>

Toxicology reports revealed that both defendant and the victim had

methamphetamine in their system at the time of the incident.

A forensic pathologist testified that he conducted an autopsy of the victim's body

in this case.  He identified a total of 88 wounds on the body, including stab wounds,

incisions created by a slicing motion, puncture marks, and superficial cuts.  The stab

wounds included at least 16 wounds to the chest; three wounds to the neck; and stabs to

the victim's right thigh, leg, head, and face.  In the pathologist's opinion, at least 24 of

the stab wounds could have individually been considered fatal.  The pathologist also

noted wounds to the victim's abdomen, back, and buttocks.

The pathologist opined that (1) the angles of the stabs to the victim's chest

suggested the victim was moving while being stabbed; (2) wounds on the victim's

_____

    [4]  Specifically, messages from defendant's phone sent to the victim's phone stated that she believed the victim was " 'whoring around,' " was " 'probably with someone else,' " and that, " 'I know you're with someone.' "

5

shoulders suggested they were inflicted while the victim turned his back toward the driver's door of the vehicle to get away; (3) wounds on the victim's legs suggested the victim had lifted his legs in a defensive position; and (4) wounds on the victim's arms suggested the victim used his arms to shield himself. The pathologist also opined that the wounds to the victim's face and neck were likely inflicted immediately prior to the victim's death, since there was no blood in the victim's stomach or airway and a living person has a natural tendency to swallow blood in his mouth.

    4. <u>Defendant's Statements to Investigators</u>

Defendant voluntarily submitted to an interview with investigating officers after being advised of her *Miranda*[5] rights. During the interview, defendant admitted that she stabbed the victim multiple times, including in his eyes, tongue, mouth, nose, and throat. Defendant specifically stated that she continued to stab the victim because " 'He was coming back' "; " 'He wasn't dying' "; and " 'I had to finish him.' "

Investigators asked upward of 20 times whether the victim had subjected defendant to physical abuse in the past, but defendant never described any such abuse. Defendant also never suggested the victim acted in any manner to inflict physical injury on the date of the incident and did not suggest the victim wielded a knife during the incident. Instead, defendant told investigators that she was a deeply religious person, that the victim did not share her beliefs, and referred multiple times to the fact that the victim attacked her religious beliefs. She stated that the victim was mentally abusing her by

_____

    [5] *Miranda v. Arizona* (1966) 384 U.S. 436.

6

trying to take over her thoughts by " 'put[ting] things in [her] head that [she] knew were . . . not true.' "

5. <u>Defendant's Testimony at Trial</u>

Defendant testified in her own defense at trial. According to defendant, she was physically, emotionally, and verbally abused by her father as a child, as well as by a prior boyfriend as an adult. She and the victim had been in a dating relationship since sometime in 2018. Defendant admitted that less than two weeks prior to the incident, she had exchanged text messages with the victim in which the two accused each other of infidelity in their relationship.

Defendant testified she had been a consistent methamphetamine user since the age of 15. She was already addicted to methamphetamine when she first met the victim; and the victim began using methamphetamine and marijuana during the course of their relationship. After the victim began using methamphetamine, he became controlling, possessive, and sometimes violent. The victim controlled defendant's methamphetamine supply, and defendant described several past instances in which she alleged the victim physically abused her or threatened her with a knife.

According to defendant, she would occasionally experience visual and auditory hallucinations while using drugs. On the night before the incident, she and the victim were traveling together in a delivery truck used by the victim in his employment. They used methamphetamine together while inside the truck. She began "seeing things different", observed the victim's face and body start to change in appearance, and

7

observed their environment change to appear apocalyptic.[6] Defendant recalled arguing with the victim, seeing the victim pull out a knife, and hearing the victim threaten to kill her. In response, defendant grabbed a knife from a backpack and began to stab the victim numerous times. Defendant initially testified that she was "seeing . . . black" and "lost sight" as she was stabbing the victim, but she also testified that she was hallucinating and was stabbing the victim because the victim took on the appearance of a devil.

Defendant acknowledged that a 911 call placed the morning of the incident depicted the victim's voice stating, "Help me, I'm stabbed," and further acknowledged that her voice could be heard yelling in the background.[7] She further acknowledged that a clicking sound could be heard on the recording, which could have been the sound of the truck door opening. After a period of time, the recording depicted another clicking sound, after which, defendant's voice could be heard with the sound of loud traffic in the background.

Defendant attempted to explain her prior statements regarding the incident by expressing the belief she was still hallucinating at the time of her interview with investigators. She asserted that she was never given an opportunity to fully explain what happened during the interview.

---

[6] Specifically, defendant testified that she saw "lots of black smoke," "the hills were burning in flames," and "the stars were falling from the sky."

[7] Portions of the victim's recorded 911 call were played for the jury during defendant's testimony.

6. Additional Defense Witnesses

Defendant called a clinical and forensic psychologist to opine that defendant suffered from intimate partner violence syndrome; suffered from severe post- traumatic stress disorder; and displayed signs of psychosis attributable to the use of methamphetamine. According to the psychologist, defendant's condition would have rendered her "hypervigilant to danger." The psychologist acknowledged that the use of methamphetamine could have led to a heightened state of paranoia, hallucinations, and delusions in defendant and the use of methamphetamine in this instance "made the whole thing crazier"; but, he opined that defendant likely would have perceived she was in danger at the time of the incident, even absent methamphetamine use.

Defendant's sister testified that she had witnessed obsessive and controlling behavior by the victim during the course of defendant's relationship with the victim. She had previously observed bruises on defendant's legs but acknowledged that defendant never told her how defendant obtained those injuries. She also responded to calls for help from defendant on several occasions where the victim abandoned defendant on the side of a road.

One of the victim's coworkers testified that he once encountered defendant and the victim on the side of a road, but he could not remember the nature of the encounter. A defense investigator later testified that the coworker previously claimed he had witnessed the victim repeatedly striking defendant during this encounter.

C. *Jury Instructions, Verdict and Sentence*

The jury was instructed on two theories of first degree murder: (1) the murder was

9

willful, deliberate and premeditated; and (2) the victim was murdered by torture. At defendant's request, the jury was also instructed pursuant to the standard jury instructions for imperfect self-defense. At the People's request, the trial court also gave the following special instruction: "Imperfect self-defense does not apply if the defendant's belief in the need for self-defense was entirely delusional."[8]

The jury returned a verdict finding defendant guilty of first degree murder (§ 187, subd. (a)) and finding true the special allegation that defendant used a deadly weapon in the commission of the offense (§ 12022, subd. (b)(1)). As a result, defendant was sentenced to a term of 25 years to life in state prison and an additional, consecutive term of one year for use of a deadly weapon. Defendant appeals from the judgment.

## III. DISCUSSION

On appeal, defendant attacks the sufficiency of the evidence to support her conviction for first degree murder, the propriety of the special jury instruction regarding imperfect self-defense, and the accuracy of the abstract of judgment. As we explain, we find no error warranting reversal but agree that the abstract of judgment must be corrected to accurately reflect the trial court's oral pronouncement.

---

[8] At the time of trial, defendant did not object to the giving of a special instruction but instead proposed an alternative version of the same special instruction, which would have stated: " 'The defendant may have mistakenly believed the actual circumstances required her defensive act, even if her reaction was distorted by delusion, but her defensive act may not have been the result of purely delusional perception of [a] threat.' " However, the trial court opted to use the People's version of the special instruction.

10

A.  *General Legal Principles*

"Murder is the unlawful taking of the life of a human being or fetus with malice aforethought."  (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 491 (*Pettigrew*); § 187, subd. (a).)  " 'If the murder is "willful, deliberate, and premeditated," it is first degree murder.' "  (*In re Lopez* (2023) 14 Cal.5th 562, 580; § 189, subd. (a).)  Murder by torture is also a type of " 'willful, deliberate, and premeditated killing' that section 189 has listed as categorically 'murder of the first degree' . . . ."  (*People v. Brown* (2023) 14 Cal.5th 453, 464 (*Brown*).)

"[F]irst degree 'murder by means of torture' is 'murder committed with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain.'  . . .  'In labeling torture as a "kind" of premeditated killing, the Legislature requires the same proof of deliberation and premeditation for first degree torture murder that it does for other types of first degree murder.' "  (*Brown*, *supra*, 14 Cal.5th at p. 464.)  This requirement "effectuate[s] the Legislature's understanding that a murder by [this] means involves, by its nature, a mental state more 'cruel and aggravated' than malice—a mental state equivalent in turpitude to willfulness, deliberation, and premeditation—but that it need not involve the premeditated intent to kill."  (*Id.* at pp. 465-466.)

"A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter."  (*People v. Rios* (2000) 23 Cal.4th 450, 460 (*Rios*).)  " 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger . . . , the defendant is deemed to have acted without

11

malice and thus can be convicted of no crime greater than voluntary manslaughter.' " (*People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1446 (*Mejia-Lenares*); *Rios*, at p. 461; *People v. Schuller* (2023) 15 Cal.5th 237, 243.) Thus, "imperfect self-defense is not a true defense, but instead is a shorthand description of one form of voluntary manslaughter, a lesser included offense of murder." (*Mejia-Lenares*, at p. 1446.)[9]

B. *The Trial Court Did Not Err in Giving a Special Instruction on Imperfect Self-Defense*

We turn first to defendant's claim that the trial court erred by incorrectly instructing the jury on the issue of imperfect self-defense. Specifically, defendant claims on appeal that it was error[10] for the trial court to give a special instruction explaining that: " 'Imperfect self-defense does not apply if the defendant's belief in the need for self-defense was entirely delusional.' " We review this claim of instructional error de novo (*People v. Parker* (2022) 13 Cal.5th 1, 66; *People v. Myles* (2023) 89 Cal.App.5th 711, 728-729 [" 'The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions

---

[9] The doctrine of imperfect self-defense is also sometimes referred to as unreasonable self-defense. (*People v. Mills* (2012) 55 Cal.4th 663, 668.)

[10] The nature of defendant's assertion of error is somewhat elusive. The objection asserted in the trial court was that the special instruction proposed by the People was incomplete and misleading; the opening brief asserts that the instruction itself was "incorrect" or that it operated to "withdraw" the ability to argue imperfect self-defense, without much elaboration; and defendant suggests in both her opening brief and reply that the instruction is incorrect because the underlying law that the instruction is based upon must be revisited.

effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration.' "]), but we find no error on this record.

To the extent defendant implies that the special instruction constituted an incorrect statement of the law, we disagree. In *People v. Elmore* (2014) 59 Cal.4th 121 (*Elmore*), our Supreme Court considered "whether the doctrine of unreasonable self-defense is available when belief in the need to defend oneself is entirely delusional" and concluded that, "[a]t a trial on the question of guilt, the defendant may not claim unreasonable self-defense based on insane delusion." (*Id.* at p. 130.) In reaching this conclusion, our high court reasoned that "a claim of delusional belief in the need for self-defense is reserved for the sanity phase, where it may result in *complete exoneration* from criminal liability," but "[i]t may not be employed to *reduce* a defendant's degree of guilt" because doing so would permit a defendant to "argue first that their mental condition made them guilty of a lesser crime, and then that the same condition made them not guilty at all by reason of insanity." (*Id.* at p. 145.) Thus, as defendant concedes in her reply brief, the special instruction was a correct statement of the law.

Defendant also suggests that the trial court erred in giving the special instruction because the instruction contradicted the trial court's determination that there was sufficient evidence to support giving instructions on the doctrine of imperfect self-defense. However, this argument conflates the role of the trial court in determining whether an instruction is warranted with the role of the jury as the trier of fact. "A trial court must instruct on a lesser included offense . . . whenever there is evidence sufficient to deserve consideration by the jury, i.e., evidence from which a reasonable jury

13

composed of reasonable persons could have concluded a lesser offense, rather than the charged crime, was committed. . . . The determination whether sufficient evidence supports the instruction must be made without reference to the credibility of that evidence." (*People v. Marshall* (1996) 13 Cal.4th 799, 846-847.) Thus, the trial court's determination that an imperfect self-defense instruction is warranted involves only a determination that certain evidence could support a finding of imperfect self-defense if such evidence was credited by the jury. Such a determination does not preclude the trial court from giving instructions regarding how the law should be applied if the jury rejects such evidence as the trier of fact.

Defendant also suggests that the special instruction somehow "effectively withdrew her critical defense of imperfect self-defense." Defendant has not provided any reasoned argument or discussion to explain this assertion, forfeiting the issue on appeal. (*People v. Sorden* (2021) 65 Cal.App.5th 582, 602 [failure to provide legal argument or citation to authority forfeits issue on appeal]; *People v. Kocontes* (2022) 86 Cal.App.5th 787, 877 [same].) Even in the absence of forfeiture, we find this assertion unpersuasive.

Contrary to defendant's assertion on appeal, the special instruction did not "withdraw" her ability to argue imperfect self-defense or somehow negate the standard jury instructions regarding imperfect self-defense. Instead, the special instruction directed the jury to ignore the imperfect self-defense instructions if it determined that the

defendant's purported belief in the need for self-defense was entirely delusional.[11]  There was nothing improper about giving such an instruction.  "[W]hen the jury, in the exercise of [its] function of passing on the evidence, reject[s] the evidence tending to prove a fact, and conclude[s] that the fact does not exist, there is no longer any occasion for them to consider or apply to the case any instruction as to the legal effect of the existence of that fact."  (*People v. Palmer* (1946) 76 Cal.App.2d 679, 686-687; see *People v. Chism* (2014) 58 Cal.4th 1266, 1299 [trial court may instruct jury to "disregard an instruction that applies to facts determined not to exist"].)  Thus, we are unpersuaded by defendant's suggestion that the special instruction somehow effectively withdrew her ability to assert imperfect self-defense.

Finally, we decline to entertain defendant's argument that *Elmore* was wrongly decided and should be revisited.  As defendant acknowledges, under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, "all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction," and "[t]he decisions of [the California Supreme Court] are binding upon and must be followed by all the state courts of California."  (*Id.* at p. 455.)  " 'Arguing that a California Supreme

---

**11**  We observe that the alternative special instruction requested by defendant at the time of trial stated:  " 'The defendant may have mistakenly believed the actual circumstances required her defensive act, even if her reaction was distorted by delusion, but her defensive act may not have been the result of purely delusional perception of [a] threat.' "  Thus, even if the trial court had adopted defendant's version of the special instruction, it would have had the same effect, because it instructed the jury that imperfect self-defense cannot be found if the jury determined defendant's belief was "purely delusional."

15

Court case was "wrongly decided" is not productive,' " and "we are compelled to reject" such arguments. (*Williams v. RGIS, LLC* (2021) 70 Cal.App.5th 445, 450.)

Because binding California Supreme Court authority holds that a defendant is not entitled to an imperfect self-defense instruction where the defendant's belief in the need for self-defense is entirely delusional, it was proper for the trial court to give a special instruction informing the jury that the imperfect self-defense instructions would not apply if the jury made a factual determination that defendant's purported need for self-defense was entirely delusional. Thus, we conclude defendant has not shown instructional error on this point and, in the absence of error, we have no occasion to consider the parties' additional arguments related to prejudice.

C. *Substantial Evidence in the Record Supports Defendant's Conviction*

Defendant also argues that there was insufficient evidence to support her conviction for first degree murder. " ' "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." ' " (*People v. Myles*, *supra*, 89 Cal.App.5th at p. 739.) "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Powell* (2018) 5 Cal.5th 921,

944.)

In this case, the jury was instructed on two alternative theories of first degree murder: (1) the killing was committed with premeditation and deliberation, and (2) the killing constituted murder by torture. On appeal, defendant challenges only the sufficiency of the evidence to support the conclusion that she harbored the necessary mental state to be convicted under either of these theories. We conclude that substantial evidence supports defendant's conviction on a theory of premeditation and deliberation and, as a result, need not address the alternative arguments regarding the sufficiency of the evidence with respect to a theory of murder by torture.

1. The Record Contains Substantial Evidence of Premeditation and Deliberation

"To prove a killing was willful, deliberate, and premeditated, the People are not required to prove the defendant 'maturely and meaningfully reflected upon the gravity of his or her act.' " (*Pettigrew*, *supra*, 62 Cal.App.5th at p. 491.) Instead, " ' "[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." [Citation.] In this context, " 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' " (*Ibid.*; *People v. Lee* (2011) 51 Cal.4th 620, 636.) "The *extent* of the reflection is key, not its *duration*; thoughts may rapidly follow each other and a cold and calculated judgment to kill may be arrived at very quickly." (*Pettigrew*, at pp. 491-492.)

In this case, an audio recording of the victim's 911 call was played for the jury.

17

Defendant admitted that the recording (1) depicted the victim's voice stating he had been stabbed and requesting help; (2) had sounds consistent with the doors to the truck being opened; and (3) depicted defendant's voice yelling at the victim with the sound of traffic in the background. Consistent with this recording, an eyewitness testified that he observed defendant exit the truck and run across multiple lanes of the highway before returning to the truck, opening the driver's side door, yelling at the victim, and re-entering the truck. During this time, the eyewitness testified that he observed the victim bleeding from the stomach area but did not observe blood on the victim's face or head. The medical examiner testified that the lack of blood in the victim's stomach or airway suggested the wounds to the victim's face and neck were inflicted at or very near the time of death. Finally, the jury was presented with defendant's own admissions in which defendant admitted that she stabbed the victim in his eyes, tongue, mouth, nose, and throat because " 'He wasn't dying' "; " 'He was coming back' "; and " 'I had to finish him.' "

Based upon this evidence, the jury clearly could conclude that (1) defendant initially injured the victim with wounds that were not immediately fatal; (2) defendant left the victim alone in the truck for a period of time in which the victim remained conscious and able to make an emergency call for help; (3) defendant returned to the vehicle a short time later while the victim was still attempting to call for help; and (4) defendant proceeded to inflict numerous, lethal wounds to the victim, including stabs directly to the victim's face and neck when she discovered the victim was still alive. Given this timeline, the jury could also clearly conclude that the wounds to the victim

18

were not inflicted in a single outburst of violence, but that defendant reached a calculated decision to kill the victim after a time of reflection following her initial attack. As such, substantial evidence in the record supports a finding that defendant acted with premeditation and deliberation when killing the victim.

2. The *Anderson* Factors Also Permit Finding Premeditation and Deliberation

On appeal, defendant relies heavily on *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*) to argue that the evidence was insufficient to show premeditation and deliberation. *Anderson* "discusse[d] three types of evidence commonly shown in cases of premeditated murder: planning activity, preexisting motive, and manner of killing." (*People v. Solomon* (2010) 49 Cal.4th 792, 812 (*Solomon*); *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294 ["[T]he so-called *Anderson* factors . . . are three types of evidence commonly present in cases of premeditated and deliberate murder."].) According to defendant, the evidence in this case is necessarily insufficient to show premeditation and deliberation because there is an absence of evidence in all three categories described in *Anderson*.

However, we question whether reliance on the *Anderson* framework is appropriate in this case. As defendant acknowledges, our Supreme Court has since repeatedly cautioned that " '*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation.' " (*Solomon*, *supra*, 49 Cal.4th at p. 812; *People v. Pride* (1992) 3 Cal.4th 195, 247; *People v. Koontz* (2002) 27 Cal.4th 1041, 1081; *People v. Sandoval* (2015) 62 Cal.4th 394, 424 (*Sandoval*) ["Since *Anderson*, we have emphasized

19

that its guidelines are descriptive and neither normative or exhaustive, and that reviewing courts need not accord them any particular weight."]; AOB 28-29.) Perhaps more importantly, as our Supreme Court has specifically recognized, "the *Anderson* factors 'are not well adapted to a case . . . in which the defendant's postoffense statements provide substantial insight into the defendant's thought processes in the crucial moments before the act of killing." (*Sandoval*, at pp. 424-425.) That is clearly the case here, where defendant's postoffense statements to investigators were presented to the jury, and where defendant also testified at trial regarding her state of mind, as well as the facts and circumstances surrounding the killing.

Regardless, even if we were to apply the *Anderson* framework to this case, we would conclude that the evidence is sufficient to support the verdict. First, we disagree with defendant's argument that the manner of killing did not support a finding of premeditation under *Anderson*. The evidence showed that the victim sustained multiple stab wounds directly to the chest, face, neck, and head. Evidence that the killer inflicted wounds to vital areas such as the victim's head, face, and neck can support an inference of a reasoned decision to kill. (See *People v. Morales* (2020) 10 Cal.5th 76, 91 [citing numerous cases holding that fatal wounds to the neck are indicative of a deliberate intent to kill]; *People v. Lewis* (2009) 46 Cal.4th 1255, 1293 [act of slashing victim's throat " 'is indicative of a reasoned decision to kill' "]; *People v. Williams* (2018) 23 Cal.App.5th 396, 410 [Despite evidence of blunt force trauma injuries all over victim's body, evidence of two stabs to the victim's neck could support a jury's determination that the killing was intentional and deliberate.].)

20

More importantly, the "manner of killing" evidence described in *Anderson* refers to more than merely the nature of the wounds inflicted on the victim. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1127 [evidence that defendant may have stopped his attack before retrieving a second weapon to inflict killing blow was evidence relevant to the "manner of killing"].) As we have already set forth, the evidence in this case supported a reasonable conclusion that there were two, distinct attacks upon the victim: an initial attack that resulted in wounds that were not immediately fatal, followed by a second, more brutal attack involving stabs to the victim's face and neck. This evidence suggests that the "manner of killing" involved a decision to inflict fatal wounds that was formed after a time of reflection, regardless of what may have caused the initial outburst of violence.

Further, defendant's assertion that there was no evidence of motive is unsupported by the record. Our review of the record shows that the jury was presented with evidence of multiple, potential motives for the killing. Evidence of a religious disagreement is relevant to show a defendant's motive to commit murder (*People v. Nicolaus* (1991) 54 Cal.3d 551, 576-577), and the jury was presented with defendant's statements to investigators expressly stating that she felt the victim had attacked her religious beliefs to where she felt it was mentally abusive. Evidence of infidelity in a romantic relationship is relevant to show a defendant's motive to commit murder (*People v. Houston* (2005) 130 Cal.App.4th 279, 307), and the jury was presented with evidence that defendant and the victim had recently exchanged accusations of infidelity. Evidence that the victim "was engaged in conduct that could provoke retaliation" is relevant to the issue of motive

21

(*People v. Johnson* (2019) 32 Cal.App.5th 26, 62); and defendant's own testimony in this case established that she felt the victim was overly restrictive in controlling defendant's supply of drugs and, that she believed defendant had physically abused her in the past.

Thus, our review of the record discloses evidence of multiple, potential motives for defendant's desire to kill the victim. The fact that "the People did not point to any motive and, indeed, could not do so" is of little consequence. The prosecution is not required to establish the existence of a motive for murder (*People v. Snow* (2003) 30 Cal.4th 43, 97 ["[M]otive 'is not an element of the crime charged and need not be shown.' "]; *People v. Holmes*, *McClain and Newborn* (2022) 12 Cal.5th 719, 792-793 [same].) Thus, the fact that the prosecutor chose not to focus any argument on the issue of motive does not mean that the jury was never presented with evidence bearing on the issue.

We acknowledge that there was little evidence of planning activity. However, under *Anderson*, " 'evidence of motive in conjunction with planning or a deliberate manner of killing' " constitutes "substantial evidence from which a rational trier of fact could have found beyond a reasonable doubt that defendant committed a premeditated and deliberate murder." (*People v. Cole* (2004) 33 Cal.4th 1158, 1225.) Thus, even if we were to apply the *Anderson* framework to this case, we would conclude that substantial evidence supports defendant's conviction for first degree murder on a theory of premeditation and deliberation.

3. <u>We Need Not Consider Alternate Theories of First Degree Murder</u>

"A first degree murder verdict will be upheld if there is sufficient evidence as to at

least one of the theories on which the jury is instructed, 'absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 552; *Sandoval*, *supra*, 62 Cal.4th at p. 424 [declining to decide whether there was sufficient evidence of murder by means of lying in wait where there was sufficient evidence of premeditation and deliberation]; *People v. Covarrubias* (2016) 1 Cal.5th 838, 892 at fn. 22 [where evidence is sufficient to support conviction on one theory upon which jury was instructed, conviction may be affirmed without considering whether evidence was also sufficient to convict the defendant under an alternative theory of liability].)

As we have already explained, substantial evidence in the record supports defendant's conviction for first degree murder under a theory of premeditation and deliberation. Thus, even assuming without deciding that the evidence may be insufficient to support a conviction based upon a theory of murder by torture, this would not be a basis for reversal. As a result, we need not discuss defendant's challenge to the sufficiency of the evidence to support a murder-by-torture theory.

D. *SENTENCING ISSUES*

Finally, defendant argues that her abstract of judgment must be corrected to accurately reflect the trial court's oral pronouncement of judgment. Specifically, the trial court sentenced defendant to a term of 25 years to life and a consecutive, one-year term based upon the jury's true finding that defendant personally used a deadly weapon in the commission of the offense. However, the abstract of judgment states that defendant's sentence is 26 years to life. "Where there is a discrepancy between the oral

23

pronouncement of judgment and the abstract of judgment, the oral pronouncement controls" (*People v. Whalum* (2020) 50 Cal.App.5th 1, 15); and, " 'appellate courts . . . that have properly assumed jurisdiction of cases [[may] order] correction of abstracts of judgment that [do] not accurately reflect the oral judgments of sentencing courts.' " (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  The People concede and we agree that the abstract of judgment in this case does not accurately reflect the oral pronouncement of judgment, and we direct the trial court to amend the abstract of judgment accordingly.

## IV.  DISPOSITION

Upon issuance of the remittitur, the trial court is directed to (1) amend the abstract of judgment to reflect a sentence of 25 years to life in state prison on count 1, followed by a consecutive term of one year, and (2) forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS            
J.

We concur:

MILLER        
          Acting P. J.

MENETREZ       
          J.